**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **AMID/METRO PARTNERSHIP, LLC** | **CIVIL ACTION NO.** |
| **Plaintiff** | |
| **v.** | **SECTION: "   "** |
| **RIVER BIRCH, INC., HIGHWAY 90, LLC, FREDERICK R. HEEBE, and ALBERT J. WARD, JR.** | |
| **Defendants** | **MAGISTRATE JUDGE:** |

## COMPLAINT

**NOW INTO COURT,** through undersigned counsel, comes AMID/Metro Partnership, LLC ("AMID/Metro"), Plaintiff herein, and files this Complaint against River Birch, Inc., Highway 90, LLC, Frederick R. Heebe, and Albert J. Ward, Defendants herein, alleging and stating the following, on belief and information presently available:

## INTRODUCTION

1.     This litigation arises out of the unlawful, corrupt, and anticompetitive pattern of conduct by Defendants River Birch, Inc., its owners, officers, and affiliated entities, (collectively, "the River Birch Defendants"), taken in concert with other alleged co-conspirators, known and unknown, in an effort to dominate the landfill disposal business in the greater New Orleans metropolitan area, which is the relevant geographical market, including Orleans, Jefferson, Plaquemines and, St. Tammany Parishes and the immediate surrounding area ("the New Orleans Market").

2.      Covering a period of years, the River Birch Defendants have participated in an ongoing conspiracy to limit and exclude competition for landfill disposal services in and around the New Orleans Market. Actions taken pursuant to this conspiracy include the attempted systematic corruption of the political and administrative processes as part of a concerted effort to economically injure competing landfill operators serving the Region, and thereby, allowing the River Birch Defendants to benefit economically as a result of the River Birch Defendants' corrupt activities and practices.

3.      As a result of the ongoing criminal investigation allegedly involving the River Birch Defendants, it clearly appears the River Birch Defendants targeted the "Construction and Demolition" ("C&D") landfill operators in competition with the River Birch Defendants who were involved in the massive Hurricane Katrina clean-up and recovery operations. The clean-up and recovery operations involved numerous federal, state and local agencies.   The evidence now shows the River Birch Defendants improperly and unlawfully participated in a conspiracy to knock-out competition.  These wrongful actions occurred after federal, state and local officials appropriately decided that the City of New Orleans Type III C&D Gentilly Landfill (hereinafter "the Gentilly Landfill"), operated under contract by AMID/Metro, would play a major role in the massive clean-up and recovery operations. Once this decision was made, it is now being revealed that the River Birch Defendants put in high gear their illicit and wrongful conspiratorial conduct.  Under any scenario, as one of the three approved C&D landfill operators for the Katrina clean-up operation, the River Birch Defendants would have benefitted from their share of the massive clean-up efforts. Apparently, the River Birch

Defendants wanted all of the debris business.

4.      It is now evident that it was the River Birch Defendants who first singled-out their main C&D landfill competitor, the Gentilly Landfill, as the target of a relentless, multi-faceted campaign of anticompetitive and wrongful conduct.  The River Birch Defendants then broadened their anticompetitive and wrongful conduct when they also targeted Waste Management of Louisiana, LLC's East New Orleans landfill known as the "Chef Menteur" landfill.  These two landfills had each been permitted and/or approved and were selected by federal, state and local authorities for the specific purpose of helping to expedite the unprecedented massive clean-up of New Orleans.  Defendants' improper actions included at least, outright bribery of a political figure, secret payments to a well known and outspoken media personality purporting to act in the public interest and the numerous other unknown wrongful acts that have been concealed but will likely be revealed either in the ongoing criminal investigation or through civil discovery.  These actions were all in an effort to unlawfully and unfairly influence the approval, permitting and operations of the River Birch Defendants' landfill competitors in the New Orleans Market.

5.      The Gentilly Landfill underwent a relentless attack from what has now been revealed as the River Birch Defendants. As a result of their multifaceted campaign of anticompetitive and wrongful conduct, the exemplary work in appropriately handling large, daily volumes of debris performed by AMID/Metro in operating the City of New Orleans' landfill was significantly hampered when regulatory-approved daily volumes were significantly decreased and administrative issues and costs significantly increased.

These actions occurred despite the strong environmental support from both federal and state environmental regulatory agencies.  In fact, both the federal and state environmental agencies fully supported the continued use of the Gentilly Landfill. Nevertheless, the daily volumes permitted to be disposed of at the Gentilly Landfill were significantly decreased resulting in an unwarranted and recently discovered illegal financial benefit to the River Birch Defendants.

6.      A landfill in New Orleans East owned and operated by Waste Management – the "Chef Menteur" landfill – was one of the targets of the River Birch Defendants' wrongful conduct. Chef Menteur had been approved by the City of New Orleans under an Executive Order and the Louisiana Department of Environmental Qualtiy ("LDEQ") as a C&D disposal site specifically permitted to accept the expanded scope of C&D debris required in the wake of Katrina.  Ultimately, Waste Management was unable to overcome and survive the recently disclosed River Birch Defendants' unlawful conduct, and, as a result, in August 2006, after only 6 months of operations, the Chef Menteur landfill was permanently closed.

7.      The River Birch Defendants' wrongful conduct that caused a significant reduction in daily volumes at the Gentilly Landfill not only damaged AMID/Metro and the City of New Orleans, but it hampered New Orleans and its taxpayers with increased travel time and related costs for transporting debris across the Mississippi River to the River Birch landfills in far western Jefferson Parish.  AMID/Metro and the City of New Orleans economically suffered from the diversion of waste streams from the Gentilly Landfill to the River Birch landfills.  By delaying and impeding the rebuilding of the flood-ravaged

City, however, the River Birch Defendants extracted a far greater cost on her citizens.  As the reported criminal investigation of the River Birch Defendants unfolds, it has become apparent that the River Birch Defendants' reliance on dirty tricks, improper influence of public officials, and the abuse of the political process as part of a concerted effort to prevent competition was not an isolated event limited to AMID/Metro, the City of New Orleans and the Gentilly Landfill.

8.      Although the full extent of the River Birch Defendants' wrongful conduct and the far-reaching aspects of its conspiracy have not yet fully come to light due to the secretive process of the federal grand jury and ongoing federal criminal investigations, upon information and belief, the River Birch Defendants' pattern of unfair competition and outright corruption designed to restrict or eliminate landfill disposal competition appears to have been far reaching in the New Orleans Market and may even extend to other competing landfills in distant parishes of Louisiana, for example, the Two Rivers Recycling Landfill (Two Rivers) in Catahoula Parish. The River Birch Defendants' conduct as set forth in this Complaint is far-removed from normal political activity or legitimate petitioning of government conduct and cannot be excused as vigorous advocacy.

9.     More than simply using the political process to increase its business, the River Birch Defendants abused and corrupted this process to attempt to maliciously damage and injure and shutdown AMID/Metro and it's operations at the Gentilly Landfill along with other competitors in the New Orleans Market area including, but not limited to, the effective shutting down of Waste Management's Chef Menteur Landfill.

10.    As of the filing of this Complaint, the River Birch Defendants' conduct has resulted in the criminal indictment and guilty plea of a former Louisiana state official, the resignations of Jefferson Parish officials who are reportedly the targets of a continuing federal criminal investigation, an FBI raid of the River Birch offices, the revelation of a list of individuals, including almost three dozen lawyers, consultants, journalists, political officials and a handful who are actually registered as lobbyists, identified as "lobbyists" on a list that federal agents purportedly seized from the offices of the River Birch Defendants, and what is rumored to be an ongoing criminal investigation of the River Birch Defendants.

11.    This Complaint seeks compensation for the financial losses suffered by AMID/Metro as a direct, proximate, and intended result of the River Birch Defendants' campaign of unlawful and unethical conduct targeted at eliminating competition for the River Birch landfills.

## THE PARTIES

12.    Plaintiff AMID/Metro Partnership, LLC is a Louisiana limited liability company with its principal place of business in Harahan, Louisiana.  Its two members are AMID Landfill, LLC, a Louisiana limited liability company with its principal place of business

in Harahan, Louisiana and Metro Disposal, Inc., a Louisiana corporation with it's principal place of business in New Orleans, Louisiana.  At all times relevant hereto, pursuant to a contract with the City of New Orleans, AMID/Metro operated and still operates the Gentilly Landfill for the City of New Orleans.

13.     Defendant River Birch, Inc. ("River Birch") is a Louisiana corporation headquartered in Gretna, Louisiana. River Birch owns and operates the River Birch landfill, which accepts and disposes of waste from the New Orleans Market.

14.     Defendant Highway 90 LLC is a Louisiana limited liability company based in Gretna, Louisiana. Highway 90 LLC owns the Highway 90 landfill, which is a Type III C&D landfill that accepts and disposes of waste from the New Orleans Market.

15.     Defendant Frederick R. Heebe ("Heebe") is a resident of Louisiana. Heebe is a lawyer, a real-estate developer and an owner of co-conspirator Shadowlake Management, Co. ("Shadowlake").  Shadowlake is the parent corporation of River Birch; Mr. Heebe has served as Vice President of River Birch. Upon information and belief, Mr. Heebe is reported to be a target of an ongoing federal criminal investigation.

16.     Defendant Albert J. Ward, Jr. ("Ward") is a resident of Louisiana. At all pertinent times, Mr. Ward served as President of River Birch, and as Manager of Highway 90 LLC. Upon information and belief , Mr. Ward is reported to be a target of an ongoing federal criminal investigation.

## THE CO-CONSPIRATORS

17.     Co-conspirator Shadowlake Management, Inc. is a corporate entity with its principal place of business in Gretna, Louisiana.  Shadowlake is owned and controlled by

Defendants Heebe and Ward.  Shadowlake is a holding company that serves as the parent company of a number of corporate entities, including River Birch, Inc. and several others. Upon information and belief, Shadowlake served as the primary instrumentality through which many of the River Birch Defendants' unlawful actions were implemented.

18.     The River Birch Defendants' actions and unlawful conduct directed at eliminating landfill competition were also taken in concert with the active knowledge and participation of various co-conspirators, known and unknown, including a former state official.

19.     Co-conspirator Henry Mouton is a resident of Louisiana. Mr. Mouton served as Commissioner of the Louisiana Department of Wildlife and Fisheries from January 2003 until his resignation in November 2008. Mr. Mouton was indicted for unlawful actions in connection with the River Birch Defendants in 2011.

<u>**JURISDICTION AND VENUE**</u>

20.     This Court has subject matter jurisdiction under 28 U.S.C. Section 1331 and 18 U.S.C. Section 1964(c) over the federal Racketeer Influenced and Corrupt Organizations ("RICO") claims. This Court also has supplemental law formerly ancillary or pendant, jurisdiction over the numerous state claims asserted herein under Article III of the U.S. Constitution and 28 U.S.C. 91367(a).

21.     Personal jurisdiction and venue are proper in this Court under 18 U.S.C. Section 1965 and under 28 U.S.C. Section 1391. The River Birch Defendants reside in, own property in, conduct business in, and are found in the Eastern District of Louisiana. The weight of the conduct at issue and the harm to competition and to AMID/Metro took

place in this judicial district.

22.     The River Birch Defendants' unlawful conduct, as alleged herein, had direct and substantial effects on both intrastate and interstate commerce.

### FACTUAL ALLEGATIONS

23.     The River Birch Defendants' have engaged in and conspired to engage in a series of unlawful, corrupt, and deceptive acts detrimental to competition, the citizens of the New Orleans Market, federal, state and local officials, and AMID/Metro over much of the past decade. The River Birch Defendants' actions have already resulted in federal indictments and/or investigations of state and local officials for bribery, corruption, and false statements to federal agents. Other public figures who advocated against River Birch's competitors are now revealed to have been identified by Defendant Heebe as secret, undisclosed "lobbyists" for River Birch.

24.     The River Birch Defendants' actions were targeted at AMID/Metro and other landfill competitors of River Birch and Highway 90, LLC in and around the New Orleans Market. As outlined below, these actions have been the direct and proximate cause of injuries to finances, business, reputation and property of AMID/Metro.

### THE CITY OF NEW ORLEANS TYPE III C&D GENTILLY LANDFILL

25.     In early 2001, the City of New Orleans publicly issued a Request for Proposal ("RFP") for the operating of a Type III C&D Landfill atop the existing City of New Orleans Gentilly Landfill.  Numerous companies with varying proposals competed in the RFP process. The contract to assist the City of New Orleans with obtaining a permit from

LDEQ and to subsequently operate the Gentilly Landfill was awarded to AMID/Metro Partnership, LLC in March of 2002.

26.     AMID/Metro is a local company whose member companies have over 50 years of experience in obtaining regulatory approval to operate permitted landfills and waste disposal companies in Louisiana.

27.     In June of 2002, LDEQ received a permit application from AMID/Metro on behalf of the City of New Orleans to construct and operate the Gentilly Landfill for the disposal of Construction & Demolition ("C&D") debris and woodwaste.  AMID/Metro spent over two years performing costly engineering, environmental design, construction and site preparation work in accordance with the proposed permit.  After determining that the permit application was technically complete and complied with the rigorous requirements of the Solid Waste Regulations, a public notice was published noting the technical completeness of the application and inviting the public to comment on the application.  LDEQ's permitting process was extensive and included public notices in both the Times' Picayune and The Morning Advocate newspapers.  LDEQ did not receive any public comments or requests for hearing on the application at any time pre-Katrina.   On December 28, 2004, LDEQ's Assistant Secretary of the Office of Environmental Services issued Standard Permit P-0375 to the City of New Orleans for the operation of the Gentilly Landfill.

28.     During the spring and summer of 2005, the Gentilly Landfill underwent additional preparatory construction in order to ready the site for acceptance of C&D debris.  The facility was scheduled to open in September of 2005.

29.     On August 26, 2005, Governor Blanco issued Proclamation No. 48 KBB 2005 declaring a state of emergency as Hurricane Katrina threatened Louisiana.  On August 29, 2005, under Proclamation No. 54 KBB 2005, Governor Blanco extended the state of emergency due to the extreme damage caused by Hurricane Katrina.  Also on August 29, 2005, the Federal Emergency Management Agency ("FEMA") issued a Disaster Declaration, FEMA-1603-DR, which was a broad based declaration providing federal relief for the catastrophic damage.

30.     One of the first needs in New Orleans, after the floodwaters receded, was to remove and dispose of massive amounts of debris blocking streets and inhibiting emergency vehicle response. The U.S. Army Corps of Engineers ("USACE") and the LDEQ established an emergency waste disposal plan.  In addition, the Gentilly Landfill was selected by federal and state officials to play a lead role in helping the overall emergency clean-up operation get underway with federal, state and local assistance.

31.     On September 29, 2005, after much discussion and deliberation between federal, state and local authorities, Dr. Chuck Brown, the Assistant Secretary for the Office of Environmental Services of LDEQ issued an Order Authorizing Commencement of Operation for Standard Permit P-0375.   At this time, LDEQ also expanded the permissible waste stream volumes that all regulated landfills in the New Orleans Market could accept as a result of the various federal, state and local emergency orders.

32.     In addition to the environmental and regulatory oversight of the LDEQ, the Environment Protection Agency ("EPA") also oversaw and approved of the operations at the Gentilly Landfill.  The EPA conducted a 3-day onsite investigation of the Gentilly

Landfill in early November of 2005 following an unprecedented media and political attack leveled at the City of New Orleans and AMID/Metro. EPA and LDEQ continued to support the operations of the Gentilly Landfill notwithstanding what has recently been revealed as  a well coordinated attack against these agencies too.

33.     In addition to the attacks against the City of New Orleans and AMID/Metro, notwithstanding the approval of the LDEQ, USACE, and EPA, a widespread and well organized local, state and federal campaign was set in motion against the competitors of the River Birch Defendants including Waste Management's Chef Menteur Landfill and the proposed Two Rivers Recycling Landfill in Catahoula Parish that also would have received post-Katrina debris if permitted.  It has recently been learned, in light of public disclosures from the ongoing criminal investigation of the River Birch Defendants' that the vast majority of the opposition campaign was financed, organized, orchestrated, directed and supported by the River Birch Defendants' and at least one former state official and public figure at their behest.

34.     Acts taken pursuant to the River Birch Defendants' efforts to thwart the operation of competing landfills appear to have included their clandestine sponsoring of lawsuits challenging the issuance, authorization and permitting of a landfill, sponsoring proposed blocking legislation, seeking additional and unprecedented environmental compliance for competitors' landfills, and manufacturing the appearance of other forms of public outcry and widespread opposition.  Although such acts may have appeared at the time to be the normal workings of the political process, as revealed in the more recent ongoing criminal investigations, and criminal indictment and plea agreement of Henry Mouton, the River

Birch Defendants' were far from ordinary actors in its vast petition of various government agencies.

35.    One of the primary criticisms repeatedly leveled against the Gentilly Landfill concerned its environmental safety, based in large part on its construction and location. This criticism continued notwithstanding the environmental and geographical approval by USACE, LDEQ and EPA.  In that regard, the public opposition fomented by Henry Mouton, then a Louisiana Department of Wildlife and Fisheries Commissioner, was particularly influential.  Starting as early as 2003, and completely unknown until his indictment, and eventual plea agreement, Mr. Mouton had been accepting illegal bribes and payoffs from the River Birch Defendants or others acting at their behest to use his position and influence to further the commercial interests of the River Birch Defendants. All told, the River Birch Defendants made more than 100 separate, illegal, and undisclosed payments to Mr. Mouton alone up to and into 2011.

36.    During 2005 and 2006, Mr. Mouton was specifically engaged by the River Birch Defendants to oppose the approval, permitting, and/or operations of various competing landfills to dispose of Katrina-related debris, including, the Gentilly Landfill, Waste Management's Chef Menteur landfill, and the proposed Two Rivers Recycling Landfill. All told, Mr. Mouton corruptly and unlawfully accepted $463,970 in payoffs and bribes from the River Birch Defendants.

37.    In exchange for the River Birch Defendants' unlawful payments, Mr. Mouton held himself out as acting in his public, official capacity as a Commissioner of the Louisiana Department of Wildlife and Fisheries serving the public interest by seeking assistance to

prevent the opening and/or continued operation of other landfills in the New Orleans Market.  In taking these actions, Mr. Mouton purported to act out of concern over the potential for harm to environmentally sensitive waterways and "preserving Louisiana's natural resources," and did so without revealing the financial interests and motives of his private benefactors at River Birch.  Acting secretly on behalf of the River Birch Defendants, Mr. Mouton personally contacted numerous public officials (frequently through the use of the mail and/or wires), including persons at the EPA, the FBI, the U.S. Attorney's Office, 17 U.S. Senators, and others to spread misleading information and to seek their assistance in stopping other landfills from competing with River Birch for post-Katrina waste disposal services under the guise of various environmental concerns. Numerous examples of such fraudulent communications are specifically detailed in the pending federal criminal case against Mr. Mouton.

38.    As one example noted in the 44 page federal indictment of Mr. Mouton, "On or about November 10, 2005, Henry M. Mouton, acting on behalf of co-conspirator "A"," believed to be a person or company associated with the River Birch Defendants, "wrote to an official with the Environmental Protection Agency in Dallas" while concealing the financial motivations of himself and others "and represented himself as a Commissioner of the State of Louisiana Department of Wildlife and Fisheries Commission." In that correspondence, Mr. Mouton "attempted to affect the EPA officials actions in an effort to keep closed the Old Gentilly Landfill located in New Orleans."

39.    Yet another example noted in the 44-page federal indictment of Mr. Mouton, "On or about January 3, 2006, defendant Henry M. Mouton, acting on behalf of co-conspirator

"A", believed to be a person or company associated with the River Birch Defendants, "wrote to a Colonel with the U.S. Army Corp of Engineers while concealing the financial motives of himself and others and represented himself as a Commissioner of the State of Louisiana Department of Wildlife and Fisheries Commission and attempted to gain the assistance of the official in an effort to keep closed the Old Gentilly Landfill located in New Orleans." Mr. Mouton took this action on the same date he received an illegal payoff of $17,000.00 from an entity associated with the River Birch Defendants "to influence and reward him for his official action."

40.    In addition to bribing a public official to directly pervert the political process, the River Birch Defendants took other actions to successfully manufacture the appearance of "public opposition" to both the Gentilly Landfill and to Waste Management's Chef Menteur facility. Specifically, the River Birch Defendants made a substantial, undisclosed interest free and unrecorded "loan" of $250,000.00 to radio host Garland Robinette after Mr. Robinette, armed with false and misleading information in direct contravention of LDEQ's and EPA's informed opinion, routinely railed against the Chef Menteur and Old Gentilly landfills based on the purportedly harmful environmental consequences of opening and operating those landfills.  So effective was Mr. Robinette in corrupting the public dialogue that even LDEQ felt it was unable to effectively communicate its position on the benefits of the Chef Menteur and Gentilly Landfills as safe and valuable alternatives to disposal at the River Birch landfill on the Westbank in Jefferson Parish. Upon information and belief, no interest or monetary payments were ever collected or paid on this purported "loan" nor were any written loan documents

executed at the time of payment of the $250,000.00 This purported "loan" and payment of $250,000.00 remained secretive and undisclosed to the public until 2011. Moreover, upon information and belief, the $250,000.00 payment to Garland Robinette was made by the River Birch Defendants through Westside Construction Services, Inc., a firm allegedly owned by River Birch's chief financial officer. This purported "loan" is also not reflected anywhere in the public records of St. Tammany Parish, the location of a piece of property allegedly used as collateral for this purported "loan." This $250,000 payment to Robinette followed his ranting and raving against the River Birch Defendants' competitors and other unusual actions in furtherance of the mission of the River Birch Defendants.

41. AMID/Metro was forced to expend substantial resources to defend and counteract the deceitful and multi-faceted opposition campaigns now known to have been sponsored and directed by the River Birch Defendants.

42. Given the expedited schedule for clearing and disposing of storm debris established by FEMA, even unfounded and illegitimate attacks that served only to delay and disrupt competing landfill operations would and did cause harm to AMID/Metro and unjustly enrich the River Birch Defendants. Significantly, when these attacks resulted in the lowering of daily volumes at the Gentilly Landfill, the River Birch Defendants because unjustly enriched.

43. With the significant daily volume reduction at the Gentilly Landfill, unnecessary and additional taxpayer funds were spent and additional time was devoted for waste disposal and transportation to less convenient landfill disposal sites owned by the River

Birch Defendants.

44.     The River Birch Defendants employed the same illegal pattern and practices used to restrict and hamper AMID/Metro, the City of New Orleans and its Gentilly Landfill, as it did to also eliminate Waste Management's Chef Menteur landfill, as well as eliminating or restricting other competitors including at least the Two Rivers Recycling Landfill and possibly even Waste Management's Woodside Landfill in Walker, Louisiana.  According to court filings relating to the federal criminal indictment of Mouton -- including Mouton's stipulation that he accepted hundreds of thousands of dollars in bribes in relation to the River Birch Defendants' "illegal schemes...to eliminate business competitors" -- the River Birch Defendants' payments to Mouton were made pursuant to an illegal scheme to eliminate the Gentilly Landfill, Two Rivers, and other landfill competitors of the River Birch Defendants.

45.     Upon information and belief, the River Birch Defendants and their co-conspirators used or caused to be used mail and/or wires as a part of their illegal and fraudulent scheme, to improperly prevent and influence the political process to secretly advance their private financial interests at the expense of AMID/Metro, other competitors, and the consumers and citizens of the New Orleans Market.

## FRAUDULENT CONCEALMENT

46.     The River Birch Defendants acted in a manner designed to actively conceal their participation in the anti-competitive and unlawful scheme described above.

47.     The River Birch Defendants' bribes, for example, were by their very nature not disclosed to the public. The River Birch Defendants acted through at least one proxy,

Henry Mouton, who was illicitly paid for his services, and was not known to be connected to the River Birch Defendants. In fact, this public official, although working on behalf of the River Birch Defendants, held himself out as performing his public duties of a State Agency.

48.     Other persons that may have acted adversely to AMID/Metro and other River Birch competitors were only recently revealed on a purported list of "lobbyists" allegedly found by federal authorities within the possession of the River Birch Defendants.

49.     Most, if not all, of the unlawful payments made to influence Henry Mouton to favor the River Birch Defendants, and disadvantage competing landfills, were made by entities clearly associated with co-conspirator Shadowlake, and with the knowledge of, but not directly by the River Birch Defendants.

50.     The concealment of the River Birch Defendants' role in the conduct described above was instrumental to the effectiveness of the conspiracy. For example, even when questioned directly about the River Birch Defendants' role in orchestrating the opposition campaign to the operation of the Chef Menteur, Gentilly, and Two Rivers landfills, Henry Mouton lied to federal agents (thereby intentionally and knowingly obstructing the government's ongoing federal criminal investigation(s)) about any connection between his conduct and Defendants Ward, Heebe, or River Birch. Mouton claimed he had received over $463,970 in payments from the River Birch Defendants for "air conditioning" repair work.  In fact, Mr. Mouton was charged with and later pled guilty to four criminal counts for lying to federal investigators regarding his connection to the River Birch Defendants and their role in his efforts to prevent the operations of the Chef

Menteur, Gentilly, and Two Rivers landfills. In filings related to his indictment and plea agreement, Mr. Mouton stipulated that it was part of this illegal bribery scheme for Mouton to conceal his relationship, "to conceal the fact that MOUTON was receiving illegal bribes," and that the River Birch Defendants "stood to benefit significantly" from the illegal scheme to eliminate competitors of the River Birch Defendants. Other revelations have only recently come to light as a result of news reports concerning a federal raid by the FBI of the River Birch offices.

51.     Until recently and despite the exercise of reasonable diligence, AMID/ Metro did not know, and could not be expected to know in the exercise of reasonable diligence, of the River Birch Defendants' unlawful, anticompetitive, and in some cases, criminal conduct, taken in opposition to AMID/Metro's business interests.  Furthermore, due to the secretive nature of the grand jury process, it was not until Henry Mouton actually entered into a plea agreement and a supporting factual basis on June 7, 2011 that the allegations in the indictment came to life.  AMID/Metro suffered through the concealed, secretive nature of the River Birch Defendants' criminal conspiracy until June 1, 2011, when light began to expose some of the rotten conduct which damaged AMID/Metro.  It appears that this is only the beginning of unwinding the criminal web spun by the River Birch Defendants as more revelations should be forthcoming as the federal criminal investigation continues. AMID/Metro specifically incorporates *in globo*, from *United States of America v. Henry M. Mouton*, Criminal No. 11-048, Section "F", United States Distrcit Court, Eastern District of Louisiana, R. Doc. No's 1, 18, and 19, and incorporate these documents by reference, herein.

## RELEVANT MARKETS

52.    The landfill disposal of C&D waste is a relevant product market.  C&D disposal is subject to strict regulation under Louisiana state law, and only those landfills permitted to accept C&D waste (Type I, II, and Ill) may do so. Given the fact that waste streams from the Katrina clean-up contained C&D waste that was commingled with other waste streams (e.g., carpet, furniture), Emergency Orders were required to expand Louisiana's definition of C&D debris to accommodate the full range of Katrina storm debris. Given the declaration of emergency following Katrina, the LDEQ and/or the City of New Orleans also used their Emergency Orders to approve certain "enhanced" C&D landfills for the purpose of expediting the disposal of debris from certain residential structures demolished on governmental orders.

53.    The landfill disposal of municipal solid waste ("MSW") is a relevant product market. MSW disposal is subject to regulation under Louisiana state law, and only those landfills permitted to accept MSW (Type I and II landfills) may do so.

54.    C&D landfills are not reasonably interchangeable with other landfills, such as Type II landfills that are capable of accepting industrial waste or MSW.  MSW may only be disposed of in a Type I or II landfill.  C&D landfills lack Type I and II landfill style liners and other protections necessary to collect leachate as would be required to dispose of MSW.

55.    Similarly, although C&D and storm debris may be disposed of in a Type I or II landfill, typically, it would not be economical to do so. Given the additional regulations, permits, and construction and operational requirements associated with Type I and II

landfills, the disposal fees (or "tipping fees") associated with such waste disposal is significantly greater than that to dispose of C&D. A ten percent increase in the price of disposal at a C&D landfill would not cause customers to dispose of C&D waste at an MSW landfill of equal distance.

56.     The United States Department of Justice has recognized landfills for the disposal of C&D and for the disposal of MSW as separate relevant products. The LDEQ also tracks MSW landfills and C&D landfills separately and subjects them to different regulations. Highlighting the differences between C&D landfills, including enhanced C&D landfills, and MSW landfills, the River Birch Defendants operate both a C&D Type III landfill and an MSW Type 1 landfill on adjacent parcels of land in Avondale, Louisiana.

57.     The great New Orleans metropolitan area is a relevant geographic market for the disposal of C&D, including post-Katrina debris, and MSW waste. The New Orleans market consists of Orleans, Jefferson, Plaquemines and, St. Tammany Parishes and the immediately surrounding areas.

58.     The transportation of C&D and MSW is bulky and expensive.  Moreover, landfills in Louisiana and surrounding states are extensively regulated, including with respect to the transportation or disposal of vegetation and woody waste from the New Orleans Market ostensibly to prevent the spread of Formosa termite infestation, which would have included all of the Katrina related woody waste generated in the New Orleans Market.  Additionally, transfer stations, which would help reduce the transportation costs to more distant landfills, are prohibited.  As a result, landfills that are located at more

distant locations were and are not realistic alternatives, and do not provide a meaningful constraint on the pricing of New Orleans area landfills.  Moreover, many landfills in other parts of Louisiana are publicly-owned and do not accept waste from outside their Parish. The United States Department of Justice has recognized that markets for landfill disposal are typically limited to those in or surrounding a metropolitan statistical area.

59.    Entry into the markets for C&D landfill disposal (Type III landfills), and for MSW landfill disposal (Type I or II) in the New Orleans Market is difficult and time consuming. The landfill siting and permitting process is political in nature and heavily regulated.  It would take many years to find suitable land, obtain the necessary permits, and construct a new landfill. This process takes substantially longer than two years.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF CIVIL RICO LAWS 18 U.S.C. §§ 1961, *et. seq.*, INCLUDING BUT NOT LIMITED TO SECTION 1962(C)

60.    AMID/Metro hereby incorporates its allegations from paragraphs 1 through 59, above, as if set forth herein, and alleges that the River Birch Defendants violated the federal civil RICO laws, 18 U.S.C. §§ 1961, *et seq.*

61.    Bribery of public officials is a specifically enumerated predicate act under civil RICO. As outlined above, and in the indictment of Henry Mouton, defendants associated with River Birch and Heebe and Ward, have paid or arranged bribes of a public official over a period of many years, starting at least as early as 2003 and continuing into January of 2011.

62.    Henry Mouton alone was indicted for accepting more than 100 separate illegal and undisclosed payments from defendants worth $463,970 over a period of years.  In

each case, the illicit payments were made for the purpose of allowing the River Birch Defendants to dominate the New Orleans Market landfill disposal markets by limiting competition.

63.     Defendants Ward, Heebe, and River Birch utilized other legal entities that they owned or controlled under the umbrella of Shadowlake to implement an unlawful scheme and to make the unlawful bribes to Henry Mouton. Upon information and belief, defendants utilized multiple, separate legal entities operating under the Shadowlake umbrella, including the companies known as "W. Inc.," "W.C.S. Inc.," "D.A.," and "A.P. LLC."

64.     The River Birch Defendants' corrupt and unlawful conduct was targeted, in part, at AMID/Metro. The express and admitted purpose of the bribes paid by or on behalf of the River Birch Defendants was to limit competition from other landfills, including but not limited to those owned and/or operated by AMID/Metro, as well as the Chef Menteur and Two Rivers landfills, and to unfairly advantage and enrich the River Birch and Highway 90 landfills.

65.     As a result of the River Birch Defendants' unlawful conduct as set forth above, AMID/Metro has suffered financial injury, including lost profits associated with the operations of the Gentilly Landfill, and made unnecessary expenditures in connection with improper activity set in motion by the River Birch Defendants.

### COUNT II: VIOLATION OF CIVIL RICO LAWS 18 U.S.C. §§ 1961, *et. seq.,* INCLUDING BUT NOT LIMITED TO SECTION 1962(D)

66.     AMID/Metro incorporates the allegations in paragraphs 1 through 65, above, as if set forth herein, and alleges that the River Birch Defendants violated the federal civil

RICO laws, 18 U.S.C. §§ 1961, *et seq.*

67.    Bribery of public officials is a specifically enumerated predicate act under civil RICO. As outlined above and in the indictment of Henry Mouton, Defendants associated with River Birch and Heebe and Ward were part of a long-running conspiracy to improperly influence and corrupt the political process for their own economic advantage. This conspiracy resulted in the payment of numerous bribes and illicit payments to Henry Mouton over a period of many years. In each case, the illicit payments were made for the purpose of allowing the River Birch Defendants to dominate the New Orleans Market area landfill disposal markets by limiting competition.

68.    Henry Mouton has pled guilty to charges that he was part of an unlawful conspiracy whose express purpose was to limit competition to the River Birch Defendants' landfills. In each instance case, the River Birch Defendants and each of the co-conspirators, known and unknown, understood and took acts in furtherance of the River Birch Defendants' goals.

69.    Defendants Ward, Heebe, and River Birch utilized other legal entities that they owned or controlled under the umbrella of Shadowlake to implement their unlawful scheme and to make the unlawful bribes to Henry Mouton. Upon information and belief, the River Birch Defendants utilized multiple, separate legal entities operating under the Shadowlake umbrella, including the companies known as "W. Inc.," "W.C.S. Inc.," "D.A." and "A.P. LLC." On information and belief "W.C.S., Inc." stands for Westside Construction Services, Inc., the entity used for the payment to Garland Robinette.

70.    The River Birch Defendants' corrupt and unlawful conduct was targeted, in part,

at AMID/Metro and designed and intended to limit competition from landfills, including but not limited to those owned and/or operated by AMID/Metro, as well as the Chef Menteur and Two Rivers landfills, which were capable of serving the greater New Orleans metropolitan market.

71.     As a result of the River Birch Defendants' unlawful conduct and conspiracy to engage in such conduct, as set forth above, AMID/Metro has suffered financial injury including lost profits associated with the operations of the Gentilly Landfill, and made unnecessary expenditures in connection with improper activities now known to have been set in motion by the River Birch Defendants.

### COUNT III VIOLATION OF LOUISIANA UNFAIR AND DECEPTIVE PRACTICES ACT

### (LA. R.S. §51:1401 et. seq.)

72.     AMID/Metro incorporates the allegations in paragraphs 1 through 71, above, as if set forth herein.

73.     The River Birch Defendants have committed a series of unfair and deceptive trade practices, including payment of bribes and improper and undisclosed benefits to a public official in order to inflict harm on AMID/Metro and to obtain improper benefits for the River Birch Defendants. The River Birch Defendants have also made, or caused to be made, numerous false statements about AMID/Metro and other rivals, and sponsored, caused, or engaged in improper activities for the purpose of delaying and crippling competition. The River Birch Defendants' conduct offends and offended established public policy is unethical, and was oppressive, unscrupulous, and/or substantially injurious.

74.     AMID/Metro is a competitor of Defendants' Highway 90 landfill. The River Birch Defendants' corrupt and unlawful conduct was targeted, in part, at AMID/Metro and was designed and intended to limit competition from a landfill operated by AMID/Metro, as well as the Chef Menteur and Two Rivers landfills, which were capable of servicing the New Orleans Market.

75.     The River Birch Defendants' conduct has negatively impacted the consumers of landfill disposal services in the New Orleans Market including, but not limited to, FEMA, LDEQ and the City of New Orleans.

76.     As a result of the River Birch Defendants' unlawful conduct as set forth above, AMID/Metro has suffered financial injury including lost profits associated with the operations of the Gentilly Landfill and made unnecessary expenditures in connection with improper activities set in motion by the River Birch Defendants.   These injuries continue to this day.

77.     AMID/Metro is also entitled to civil restitution, attorney's fees, and costs, as well as any applicable civil penalties and/or treble damages after proper notification.

### COUNT IV: VIOLATION OF LOUISIANA ANTITRUST LAWS ATTEMPT TO MONOPOLIZE (C&D LANDFILLS)

### (LA. R.S. §§51:122, 51:123, and 51:137)

78.     AMID/Metro incorporates the allegations in paragraphs 1 through 77, above, as if set forth herein.

79.     The River Birch Defendants have attempted to monopolize the C&D landfill disposal market for the New Orleans Market and, in particular, the market or sub-market for the disposal of post-Katrina-storm debris in enhanced C&D disposal sites.

80.     Defendant Highway 90, LLC possesses substantial market power in the C&D landfill disposal market for greater New Orleans. According to the LDEQ, defendants own and operate one of the few permitted C&D landfills serving the New Orleans Market and one of only three C&D landfills specifically authorized to accept the full range of Katrina storm debris as an "enhanced" C&D disposal site. That landfill contains the greatest permitted size and has the greatest remaining capacity. During the period in question for post-Katrina debris clean-up, the principal competition for the Highway 90 landfill came from the Gentilly Landfill and Chef Menteur landfill in east New Orleans and the proposed Two Rivers Landfill in Catahoula Parish.

81.     As outlined above, including through the corrupt and unlawful conspiracy and actions of the River Birch Defendants and co-conspirator Henry Mouton, the River Birch Defendants sought to place unreasonable restraints and conditions on the operation of at least the Gentilly, Chef Menteur, and Two Rivers landfills with the goal of closing or preventing the operation of the competing landfills. By late 2006, the River Birch Defendants had succeeded in closing the Chef Menteur landfill and damaged the operation of both the Gentilly Landfill and Two Rivers landfills.

82.     The River Birch Defendants' conduct has restricted choice and negatively impacted the consumers of C&D landfill disposal services in the New Orleans Market, including those services purchased for storm debris disposal post-Katrina by FEMA.

83.     As a result of the River Birch Defendants' unlawful conduct as set forth above, AMID/Metro has suffered financial injury including lost profits associated with the operations of the Gentilly Landfill, and unnecessary expenditures made in connection

with improper activities set in motion by the River Birch Defendants.

84.     AMID/Metro is also entitled to recover civil penalties, treble damages, attorney fees, and the cost of this lawsuit for the River Birch Defendants unlawful antitrust, restraint of trade, and monopolistic conduct.

## COUNT V: CIVIL CONSPIRACY

## (LA. CIVIL CODE ART. 2324)

85.     AMID/Metro incorporates the allegations in paragraphs 1 through 84, above, as if set forth herein.

86.     In taking the actions outlined above, the River Birch Defendants have conspired with each other and with other entities, known and unknown, including, but not limited to a former public official of Louisiana, to commit negligent, intentional, and/or criminal acts of unfair and unlawful competition directed against AMID/Metro and other competing landfill operators.

87.     AMID/Metro has suffered injury to its business and property as a result of the unlawful, tortious, and wrongful actions perpetrated by the intended conspiracy orchestrated and perpetrated by the River Birch Defendants.

## COUNT VI: SINGLE BUSINESS ENTERPRISE DOCTRINE

88.     AMID/Metro incorporates all the allegations in Paragraphs 1-87, as if set forth herein.

89.     Based on the tortious, deceitful, fraudulent, surreptitious, and/or criminal conduct of the River Birch Defendants and their covert and secretive scheme with known and unknown co-conspirators outlined herein, they constitute a single business enterprise, as a

result of which the subsidiary companies can be considered to be the alter ego of the parent when corporations integrate their resources in operation to achieve a common business purpose, as a result of which each business may be held liable for the wrongful acts done in pursuit of that tortious and/or criminal purpose.

90.     In conjunction with the other asserted claims herein against the River Birch Defendants and as an equitable remedy for their tortious and criminal conduct, all of the River Birch Defendants are liable to AMID/Metro under the single business doctrine for the millions of dollars in lost business and significant costs and expenses incurred by AMID/Metro to defend and counteract the River Birch Defendants covert and secret opposition and scheme against AMID/Metro and other market competitors.

### COUNT VII: CRIMINAL AND/OR CIVIL RESTITUTION

91.     AMID/Metro incorporates all the allegations in Paragraphs 1-90, as if set forth herein.

92.     The River Birch Defendants bribery is a crime and damaged AMID/Metro, causing it to sustain over $10 million in damages in lost business, as well as significant sums of money and resources to defend against and counteract the tortious, surreptitious, unethical, and criminal conduct of the River Birch Defendants.   The River Birch Defendants are liable to AMID/Metro, which is entitled to criminal, as well as civil, restitution for the River Birch Defendants criminal conduct.

### COUNT VIII: NEGLIGENCE CLAIM

### (LA. C.C. ART. 2315 AND 2316)

93.     AMID/Metro incorporates all the allegations in Paragraphs 1-92, as if set forth

herein.

94.     The River Birch Defendants had a duty of fair dealing to AMID/Metro, a duty not to negligently, intentionally, and/or fraudulently misrepresent, conceal, and/or fail to or purposely not disclose information to AMID/Metro or other third-parties in transactions or other matters in which the River Birch Defendants had a pecuniary interest, a duty to not conspire with and/or aid and abet others to act in tortious, intentional, and/or criminal ways to injure or damage AMID/Metro, a duty not to tortious, intentionally, or criminally interfere with AMID/Metro's business and/or contractual relations, a duty not to abuse its rights to compete in the marketplace by tortious, intentional, and/or criminal conduct predominately motivated to harm AMID/Metro and other business competitors and against all moral rules, good faith, and elementary fairness expected in a civilized and law-abiding society, a duty not to conduct a single-business enterprise and/or a racketeering enterprise to perpetuate tortious, intentional, and/or criminal wrongs against AMID/Metro, a duty not to commit unfair and deceptive trade practices against AMID/Metro, a duty not to convert and interfere with AMID/Metro's rights to operate the Gentilly Landfill, a duty not to unjustly enrich themselves at the expense and impoverishment of AMID/Metro due to the tortious, intentional, and/or criminal scheme conducted covertly and surreptitiously by the River Birch Defendants, and a duty not to commit crimes such as bribery, lying to federal and state public officials, mail fraud, and/or wire fraud to injure and damage AMID/Metro and other business competitors.

95.     The tortious, surreptitious, unethical, and criminal conduct, including but not limited to bribery, lying to state and federal officials, and/or mail/wire fraud, of the River

Birch Defendants breached their duty to exercise any level of care, much less reasonable care, under the circumstances, and caused AMID/Metro damages of more than $10 million in lost business, as well as significant sums of money and resources to defend against and counteract their negligent, intentional, and/or criminal behavior.

### COUNT IX:  NEGLIGENCE MISREPRESENTATION, CONCEALMENT AND/OR NON-DISCLOSURE

96.    AMID/Metro incorporates all the allegations in Paragraphs 1-95, as if set forth herein.

97.    Based on the tortious, unethical, surreptitious, and/or criminal conduct of the River Birch Defendants outlined herein, they are liable to AMID/Metro based on their legal duty in the course of their business dealings and other matters in which they had a pecuniary interest to supply correct and not false or misleading information, a duty which they breached by affirmative misrepresentation, concealment and non/disclosure, as well as by omission, causing AMID/Metro to sustain millions of dollars in damages for lost business, and significant costs and expenses to defend against and counteract the deceitful, unethical, and multi-faceted opposition secretly sponsored and directed by the River Birch Defendants.

### COUNT X:  INTENTIONAL AND FRAUDULENT MISREPRESENTATION, CONCEALMENT, AND/OR NON-DISCLOSURE, INCLUDING FRAUD AND AIDING AND ABETTING

### (LA. CC. ARTS. 1953-1958, 2315, 2316, 2324)

98.    AMID/Metro incorporates all the allegations in Paragraphs 1-97, as if set forth herein.

99.    Based on the tortious, deceitful, fraudulent, surreptitious, and/or criminal conduct of the River Birch Defendants outlined herein, they are liable to AMID/Metro for intentional and/or fraudulent misrepresentation, concealment, and/or non-disclosure to AMID/Metro and other direct and/or third parties in transactions or other matters where the River Birch Defendants had a pecuniary interest and where there was a reason to expect that the misrepresentations and/or erroneous and fraudulent information would be relied upon, directly or indirectly, and influence the transactions at issue, including but not limited to conspiring to act in concert and/or aiding and abetting with the intent to commit and actively and willfully participating in the intentional, fraudulent, and/or criminal conspiracy and venture, which was perpetuated with the intent to deceive and caused millions of dollars in lost business to AMID/Metro, as well as significant costs and expenses incurred by AMID/Metro to combat and counteract the covert and secret scheme by the River Birch Defendants, entitling AMID/Metro to also recover attorney fees.

## COUNT XI: TORTIOUS AND/OR INTENTIONAL INTERFERENCE WITH BUSINESS OR CONTRACTUAL RELATIONS

100.    AMID/Metro incorporates all the allegations in Paragraphs 1-99, as if set forth herein.

101.    The tortious, deceitful, unethical, surreptitious, and/or criminal conduct of the River Birch Defendants was maliciously undertaken by them out of ill will and/or spite and improperly and/or intentionally interfered with AMID/Metro's business and contractual relations with third parties, and caused AMID/Metro to lose millions of dollars in business and profits from actual and prospective business relations and its

contract with the third parties, as well as significant other expenses and costs to defend and counteract the malicious conduct of the River Birch Defendants.  [See Restatement (Second) of Torts § 766B.]

## COUNT XII:  ABUSE OF RIGHTS

102.    AMID/Metro incorporates all the allegations in Paragraphs 1-101, as if set forth herein.

103.    The tortious, deceitful, unethical, surreptitious, and/or criminal conduct of the River Birch Defendants outlined above was taken with the predominant motive to cause harm to AMID/Metro and other business competitors in the market and against all moral rules, good faith, and elementary fairness, causing AMID/Metro millions of dollars in lost business, as well as significant costs and expenses to defend against and combat the covert and secret scheme and criminal enterprise of the River Birch Defendants.

## COUNT XIII: CONVERSION

104.    AMID/Metro incorporates all the allegations in Paragraphs 1-103, as if set forth herein.

105.    Based on the tortious, unethical, surreptitious, and/or criminal conduct of the River Birch Defendants outlined herein, they are liable to AMID/Metro for conversion due to the unlawful interference with the ownership or possession of the hurricane debris to be disposed at the Gentilly Landfill after hurricane cleanup, which was in derogation of AMID/Metro's rights under its contract with the City of New Orleans and/or a wrongful exercise or assumption of authority over the hurricane debris waste disposal, depriving AMID/Metro of its rights to operate the Gentilly Landfill, resulting in

AMID/Metro's millions of dollars of lost business, as well as significant costs and expenses incurred by AMID/Metro to combat and counteract the covert and secret scheme by the River Birch Defendants.

## COUNT XIV: DETRIMENTAL RELIANCE

## (LA. C.C. ART. 1767)

106.    AMID/Metro incorporates all the allegations in Paragraphs 1-105, as if set forth herein.

107.    Based on the tortuous, deceitful, fraudulent, surreptitious, and/or criminal conduct of the River Birch Defendants outlined herein, they are liable to AMID/Metro for detrimental reliance under La. C.C. art. 1967 for their misrepresentations, concealments, and non-disclosures by conduct or purposeful omissions, which were justifiably relied upon by third-parties and those persons and/or entities charged with implementing the hurricane debris disposal contracts and business in the City of New Orleans, post Hurricanes Katrina and Rita, all of which detrimentally affected AMID/Metro, causing it to sustain millions of dollars in lost business, as well as significant costs and expenses to combat and counteract the covert and secretive tortuous and criminal scheme of the River Birch Defendants.

## COUNT XV:  UNJUST ENRICHMENT

## (LA. C.C. ART. 2298)

108.    AMID/Metro incorporates all the allegations in Paragraphs 1-107, as if set forth herein.

109.    Based on the tortious, deceitful, fraudulent, surreptitious, and/or criminal conduct

of the River Birch Defendants outlined herein, they are liable to AMID/Metro for unjust enrichment under La. C.C. art. 2298 at the expense and impoverishment of AMID/Metro and other market competitors in the New Orleans Market, as a result of which AMID/Metro is entitled to recover and be compensated for the amount of the River Birch Defendants unjust enrichment or AMID/Metro's unjust impoverishment, whichever is less.

<u>**PRAYER FOR RELIEF AND JURY DEMAND**</u>

**WHEREFORE**, AMID/Metro Partnership, LLC requests a trial by jury and seeks the following equitable, injunctive, and compensatory relief:

1.      An award of compensatory damages, subject to trebling under RICO, Louisiana antitrust, restraint of trade, and monopoly laws, in an amount to be established at trial, but in all accounts, in excess of $10,000,000.

2.      An award of punitive damages due to the River Birch Defendants' repeated series of intentional, reckless, tortious and unlawful conduct targeting AMID/Metro's operations and taken in reckless disregard for its impact on the post-Katrina cleanup effort.

3.      An award of attorney's fees and costs of bringing this action.

4.      Such other relief and equitable remedies as this Court deems reasonable and appropriate.

[SIGNATURE PAGE TO FOLLOW]

Respectfully submitted,

**ADAMS AND REESE, LLP**

/s/ Scott E. Delacroix
Scott E. Delacroix, T.A. (#4823)
E. Gregg Barrios (#20096)
Christopher J. Kane (#29282)
701 Poydras Street, Suite 4500
New Orleans, LA   70139
Telephone (504) 581-3234
Fax (504) 566-0201
Attorneys for Plaintiff,
***AMID/Metro Partnership, LLC***